# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT https://www.facebook.com/WannaGoHome84 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | ) ) ) ) ) ) | Case No. 24-m-628 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 §§ 1111 and 1152 or 1153(a) | Murder in Indian Country |

The application is based on these facts:

See Attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*B. M. D'Arc.* 03/28/24 at 1326
*Applicant's signature*

Brian D'Arcy, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means).*

Date: 3/28/2024

*Judge's signature*

City and state: Green Bay, Wisconsin

Honorable James R. Sickel, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
FACEBOOK ACCOUNT
https://www.facebook.com/WannaGoHome84
THAT IS STORED AT PREMISES
CONTROLLED BY META PLATFORMS,
INC.

Case No. 24-m-628

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, drug trafficking, and crimes occurring on Native American

reservations. I have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from other law enforcement officers and witnesses, my personal observations, and my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1111 and 18 U.S.C. §§ 1152 or 1153(a) have been committed against the user of the Facebook account https://www.facebook.com/WannaGoHome8. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      On October 30, 2023, Menominee Tribal Police Department (METPD) Detective Joshua Lawe was contacted by Menominee Tribal Warden Maniyan Pyawasay. Pyawasay advised Detective Lawe that her department received a call from an individual by the name of Allen Grignon who believed he may have located a human skull while hunting on October 29, 2023. On October 30, 2023, Detective Lawe, METPD Evidence Specialist/Officer Paige Lehman, and Menominee Tribal Wardens accompanied Grignon to an area off County Highway M and Crooked Hill Road on the Menominee Indian Reservation (MIR). While driving to the location, Grignon

2

informed Detective Lawe that he and his family were hunting the day before and chased a deer into the area. Grignon was walking in the woods looking for blood from the deer and came across what he thought to be a human skull. Upon arriving in the area, Grignon informed officers that they had to drive down a trail. From the trail, Detective Lawe and other officers walked into a wooded area approximately 60 to 80 yards from the trail, where Detective Lawe observed a fully intact human skull with teeth containing what appeared to be dental fillings. Detective Lawe documented the location of the skull with the following GPS coordinates: 45.022133, -88.727002. Images depicting the location of the skull are included below.





6. Following the discovery of the skull, a search of the immediate and surrounding area was conducted by the FBI Milwaukee Evidence Response Team, Menominee Tribal Enterprises employees (logging employees), METPD officers, Menominee Tribal wardens, Cadaver K9 handlers, Anthropologist Jordan Karsten, Ph.D., and University of Wisconsin – Oshkosh anthropology students. A total of four searches occurred on October 30, October 31, November 7, and November 9, 2023. These searches included a detailed search and excavation of the immediate area surrounding the skull, as well as searches and excavations of the locations where other skeletal remains were discovered. A concentrated search of the area surrounding the skull was conducted by instructing personnel to search within an arm's length of one another while raking through leaves in order to disturb the ground to help facilitate the discovery of skeletal remains. General line searches were also conducted in areas further out from the location of the

skull. During the searches, a number of skeletal remains were located. According to Dr. Karsten, the remains appeared to have been scattered by carnivore scavenging. No clothing, apparel, personal belongings, or other evidentiary items were located. An image of the assembled remains is included below.



7.      Following the recovery of the skeletal remains, the bones were examined by Dr. Karsten at the University of Wisconsin – Oshkosh Forensic Anthropology Laboratory. In his report, Dr. Karsten noted that many of the recovered skeletal elements displayed evidence of carnivore scavenging. Dr. Karsten searched the remains for any signs of trauma and noted that, "No perimortem trauma is observed." Dr. Karsten estimated that the postmortem interval, or the amount of time that has elapsed since an individual's death, was at least 119 days (July 3, 2023).

However, he noted in his report that he believed "it is more likely that the postmortem interval is at least 515 days (June 2, 2022).

8.     In an attempt to determine the identity of the remains, teeth from the discovered remains were sent to the Wisconsin State Crime Laboratory for DNA extraction. On January 26, 2024, the Menominee Tribal Police received a DNA Databank Notification: Investigative Lead Report from the Wisconsin State Crime Laboratory. The report stated that the "evidentiary DNA profile was linked in the Combined DNA Index System (CODIS) on 01/11/2024 to: Dean Ford, Date of Birth (DOB) 04/25/1992. CODIS is a database maintained by the FBI for searching DNA profiles.

9.     Following the notification from the Wisconsin State Crime Laboratory, investigators obtained dental records for Dean Ford from the Wisconsin Department of Corrections. Dr. Karsten and Forensic Dentist Gabriel Legros, D.D.S., then compared these dental records to the teeth located with the human remains. Dr. Legros' report concluded the following: "After comparing the antemortem and postmortem records, it is my opinion to within a reasonable degree of scientific and clinical reliability that Menominee Case #INV202300881 can be positively identified as Dean A. Ford (DOB 04/25/1992)."

10.     Following the identification of Ford, investigators requested any law enforcement reports involving Dean Ford from surrounding counties, as well as state probation files for Ford. According to a Shawano Police Department report, officers responded to a domestic call involving Dean Ford and his girlfriend, Taylor Cordts, at 503 East Green Bay Street in Shawano, on July 7, 2018. The report indicated that Ford had left the residence prior to the arrival of officers. On July 9, 2018, an officer spoke with Ford over the phone about the domestic incident and requested that Ford come to the police department. Ford refused and said that he would get in contact with his probation agent first. According to Wisconsin State Probation files, Ford last contacted his

6

probation agent on July 10, 2018 via text message, stating that he did not hurt his girlfriend and requesting that the warrant be dropped. Based on a review of law enforcement and state probation records that were obtained, it appears that this was the last time Ford had contact with any law enforcement authority. As far as investigators are aware, only one missing person report was made by a cousin of Dean Ford's, Sierra Ford, on April 1, 2019, to the Shawano Police Department. The complaint was taken, but Dean Ford was not entered as a missing person.

11.     On February 22, 2024, investigators interviewed the sister of Dean Ford, Hailey Alegria. Hailey said that the last time she saw and spoke with Ford in person was on July 25, 2018. Hailey also stated that she still had Facebook Messenger messages with Ford from July 23, 2018 on her phone. Hailey provided Ford's Facebook profile, which was listed as "Dean Ohh Zayynx (Randy     Moss)."     The     URL     for     the     profile     was     listed     as https://www.facebook.com/WannaGoHome84."

12.     Based on my experience working on the Menominee Indian Reservation, I am aware that Facebook and Facebook Messenger are a common way for individuals that are part of the Menominee Nation community to communicate with one another. Given this information and the suspicious circumstances surrounding the location of Ford's remains and his presumed disappearance around July 2018, I believe that obtaining an order such as that described in this search warrant application to receive the information described in Attachments A and B would assist law enforcement in determining who Dean Ford may have communicated with prior to his last sightings. This information could assist investigators in determining when Ford was last seen, who he was with, and anyone who may have information regarding his death. The potential existence of location data associated with the Facebook account may also assist investigators in determining Ford's whereabouts at the time of his death. I am requesting records from January 1, 2018, to the present in order to assist in identifying any unknown associates or potential enemies

of Ford prior to his death, and to attempt to learn more about Ford's typical behavior and movements prior to his death.

13.    Ford's sudden, unexpected, and unexplained disappearance, combined with the location and circumstances of his recovery, lead me to believe that probable cause exists Ford was the victim of a murder. Due to Ford's status as a Native American Indian and the location of his remains being within the exterior boundaries of the Menominee Indian Reservation in the Eastern District of Wisconsin, federal jurisdiction exists to investigate the incident.

## BACKGROUND CONCERNING FACEBOOK[1]

14.    Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

15.    Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

8

16.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

20.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

21.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

22.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

23.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

24.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

26.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

27.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

28.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

29.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

11

or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

32.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

33.     Based on the foregoing, I request that the Court issue the proposed search warrant.

34.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

35.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**REQUEST FOR SEALING**

36.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

13

Respectfully submitted,

_Bm.o'gh_  03|28|24 _at_ 1326

Brian D'Arcy
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____3/28/2024_____, 2024.

HON. JAMES R. SICKEL
United States Magistrate Judge
Eastern District of Wisconsin

14

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook account **https://www.facebook.com/WannaGoHome84** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

15

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **January 1, 2018 to the present**;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **January 1, 2018 to the present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **January 1, 2018 to the present**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **January 1, 2018 to the present**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government **within 14 days** of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1111 and 18 U.S.C. §§ 1152 or 1153(a) involving Dean Ford, and others as yet unknown from **January 1, 2018 to the present,** including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)    The disappearance, murder, overdose death, or accidental death of Dean Ford;

(b)    Communications between Dean Ford and others as yet unknown;

(c)    Actions taken to conceal the death of Dean Ford;

(d)    Messages, photographs, videos, memes, status updates, comments, or other postings or communications

(e)    Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(f)    Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(g)    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

4

disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

      I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

      a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

      b.    such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

      1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

      2.    the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

      I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                    Signature